UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAVIER LOPEZ CASTRO, *et al.*,

    Plaintiffs,

    v.

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND, *et al.*,

    Defendants.

Civil Action No. 13-818 (JEB)

## MEMORANDUM OPINION

Plaintiffs, who worked as laborers for a sub-subcontractor in the construction of a District of Columbia building, allege that they were underpaid for their efforts. They have sued under the federal Davis-Bacon Act (DBA), 40 U.S.C. § 3141 *et seq.*, in an effort to collect against the prime contractor's construction bond, which was secured pursuant to the District of Columbia's Little Miller Act (DCLMA), D.C. Code § 2-201.02 *et seq.* Defendant insurance companies guaranteed the bond as co-sureties. In moving to dismiss, they now maintain that Plaintiffs are not eligible to sue on the bond, and that even if they were, they have failed to comply with a one-year statute of limitations. Plaintiffs counter that they are not only eligible, but that they also benefit from a two-year limitations statute, which applies to suits brought by workers, as opposed to suppliers and sub-contractors. The Court ultimately agrees with Plaintiffs and holds both that they have stated a claim under the DBA and that their action is timely.

**I.    Background**

Plaintiffs were employed by S & J Acoustics, a second-tier subcontractor (or sub-subcontractor) retained to complete ceiling installation on the Consolidated Forensic Laboratory,

a building owned by the District of Columbia. See Am. Compl., ¶¶ 2, 5. Pursuant to the DBA, 40 U.S.C. § 3141, *et seq.*, and the DCLMA, D.C. Code § 2-201.01, *et seq.*, the project's prime contractor, Whiting-Turner Contracting Co., provided a payment bond to the District of Columbia as an assurance that project laborers would receive payment at Department of Labor-mandated hourly rates. See Am. Compl., ¶¶ 3, 8. In bringing this action against Defendants (1) Fidelity and Deposit Company of Maryland and (2) Travelers Casualty and Surety Company of America, who insured Whiting-Turner's bond as co-sureties, see id., ¶ 3, Plaintiffs allege that they were not paid for their contributions to the project in accordance with these designated wage rates. See id., ¶¶ 16-18, 21. As background, the DCLMA requires contractors on government-funded projects to secure payment bonds to protect the interests of suppliers of materials and subcontractors, and the DBA establishes prevailing wage rates for workers who contribute to government-funded construction projects.

Prior to initiating this action, Plaintiffs filed an administrative complaint with DOL, requesting that payments to the project's prime contractor be withheld until an investigation could be completed and Plaintiffs compensated for the alleged back wages. See id., ¶¶ 23-25. As the project had since wound up and all payments had been released to Whiting-Turner, the DOL investigator closed the case without making any findings on Plaintiffs' eligibility for relief under the DBA. See id., ¶¶ 24-25. After Plaintiffs brought suit and Defendants filed their Motion to Dismiss, the Court *sua sponte* raised the issue of subject-matter jurisdiction, questioning whether Plaintiffs had sufficiently exhausted their administrative remedies with DOL. See Order to Show Cause at 2-3. Out of deference to DOL's plenary role in making DBA back-wage determinations, the Court issued a temporary stay in the proceedings and ordered Plaintiffs to return to DOL and request that conclusive findings be made. See ECF No. 16

(Order) at 4.  Plaintiffs did so, but without success.  DOL refused to take further action on the ground that the government had already made all payments to the prime contractor and had no further funds to withhold.  See Joint Status Report, ¶¶ 6-7 & Exh. A.  Satisfied that Plaintiffs had made all efforts to exhaust remedies with DOL, the Court concluded that it did have subject-matter jurisdiction under the DBA and could consequently address the substance of their claims and Defendants' pending Motion to Dismiss.  See Castro v. Fid. & Deposit Co. of Maryland, No. 13-818, 2014 WL 495464 (D.D.C. Feb. 7, 2014).

Plaintiffs have since moved to amend their Complaint in order to clarify the contractual arrangement in effect between prime contractor Whiting-Turner and S&J Acoustics, Plaintiffs' employer.  See Am. Compl., ¶ 5 & Exh. B.  The Court permitted the amendment without objection from Defendants, who argue that dismissal is nevertheless appropriate.

## II.     Legal Standard

In evaluating a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," or an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

## III.    Analysis

In weighing Defendants' Motion, the Court must consider the respective scopes of

application of sections of the three statutes implicated in this case – namely, § 2-201.02 of the DCLMA, § 3144(a)(2) of the DBA, and § 255 of the Portal-to-Portal Act, 29 U.S.C. § 251, *et seq.* – and the interrelationships among them. Application of these statutes, Defendants contend, demonstrates that Plaintiffs do not qualify for any remedy. But even if they did so qualify, Defendants nevertheless maintain that Plaintiffs' suit is untimely.

To support these positions, Defendants offer a number of justifications that intersect and overlap, making them somewhat challenging to parse. What is evident is that this suit poses novel issues, and that neither Plaintiffs nor Defendants have much in the way of precedent to guide them. To date, the opinions that have discussed the DBA, the DCLMA (and its model, the Federal Miller Act), and the PPA have done so in piecemeal fashion, providing only a limited analytical framework for cases such as this one. In responding to Defendants' arguments, therefore, the Court must traverse largely uncharted territory. It thus begins with a discussion of whether a remedy is available under either the DCLMA or DBA and then proceeds to consider the limitations question.

    A.  Availability of Remedy

Defendants first argue that Plaintiffs cannot invoke the DCLMA to sue on Whiting-Turner's payment bond because eligibility under the statute is restricted to those suppliers of labor and materials that have been retained either by the prime contractor or by an immediate subcontractor. See Mot. to Dismiss at 9; Reply at 1-2. Since Plaintiffs were hired by a second-tier subcontractor, Defendants suggest that they fall outside of the scope of the statute. See Supp. to Mot. to Dismiss at 3.

Defendants further maintain that Plaintiffs also have no remedy under the DBA. They premise this argument on the text of DBA § 3144(a)(2), which provides that "laborers and

4

mechanics have the same right [of] action . . . as is conferred by law on persons furnishing labor or materials." See Reply at 4. The use of the phrase "same right," according to Defendants, demonstrates that § 3144(a)(2) does not actually grant aggrieved workers an independent cause of action, but merely references the applicable bond statute – in this case, DCLMA § 2-201.02. See Mot. to Dismiss at 9; Reply at 1 ("Plaintiffs do not have separate cause [*sic*] of action against the Defendants in this case under the DBA . . . ."). Alternatively, even if § 3144(a)(2) does create a freestanding cause of action, Defendants reason that the result should be the same because "the rights, if any, that were conferred [by §3144(a)(2)] were limited by the express terms of the bond statute." Reply at 7. The DBA, by this logic, merely duplicates the DCLMA, mirroring its procedural requirements and limitations on eligibility.

To address Defendants' contentions, the Court first analyzes the scope and requirements of the DCLMA. It then turns to an examination of § 3144(a)(2) of the DBA to determine whether it provides an independent remedy with its own terms and conditions.

    1. *The DCLMA*

The DCLMA, D.C. Code § 2-201.02 *et seq.*, is modeled after the federal Miller Act, 40 U.S.C. § 3131, and opinions interpreting the latter statute provide persuasive authority for disputes under the former. See Hartford Acc. & Indem. Co. v. D.C., 441 A.2d 969, 972 (D.C. 1982). First promulgated as the Heard Act of 1894, see Act of August 13, 1894, ch. 280, 28 Stat. 278, as amended by Act of February 24, 1905, ch. 778, 33 Stat. 811, the Miller Act was designed to address a relatively narrow yet significant dilemma posed by federally funded construction projects. Ordinarily, when a supplier or subcontractor contributes to a private construction project, it can protect itself against default by the prime contractor by securing a lien against the underlying property. Government property, by contrast, cannot generally be subject to a lien.

5

See Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 264 (1999). The principle of "sovereign immunity [leaves] suppliers . . . without the protection of the [materialman's and] mechanics' liens normally available in private industry." U.S. ex rel. E & H Steel Corp. v. C. Pyramid Enterprises, Inc., 509 F.3d 184, 186 (3d Cir. 2007) (citing Blue Fox, Inc., 525 U.S. at 264-65). Recognizing this imbalance, the Miller Act was "intended to provide an alternative remedy to protect the rights of these suppliers," F. D. Rich Co. v. U.S. ex rel. Indus. Lumber Co., Inc., 417 U.S. 116, 122 (1974), by requiring every contractor on a federal contract valued above a certain threshold to secure a payment bond in advance of construction. See 40 U.S.C. § 3131(b). The DCLMA was adopted to serve the same end, "protect[ing] subcontractors supplying labor and material to a [District of Columbia] government project." Hartford Acc. & Indem. Co., 441 A.2d at 972.

Suppliers and contractors have few procedural hurdles to contend with when they sue on a prime contractor's bond. If a supplier has not received payment within a 90-day period, it need only notify the prime contractor of its intention to collect on the bond before initiating a suit. See § 3131(b); D.C. Code § 2-201.02(a). Neither the Miller Act nor the DCLMA require the aggrieved party to seek administrative review of a claim before turning to the courts. See id.

Congress did impose sharp restrictions on the scope of the Miller remedy, however, and only those parties with close links to the prime contractor can claim the protections of the bond. Those who have an attenuated connection to a project and operate further down the chain of commerce are excluded from coverage. See F. D. Rich Co., Inc., 417 U.S. at 122. The limitations on Miller's coverage are geared to avoid the risk that a prime contractor could be held to account for the debts of a third party simply because that third party's materials happened to make their way to a job site. See, e.g., id.; U.S. ex rel. E & H Steel Corp., 509 F.3d at 187. As

6

the Supreme Court has recognized, the Miller bond remedy was designed "to extend no further than to sub-subcontractors," J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees, 434 U.S. 586, 591 (1978) (emphasis added), leaving "[t]hose in more remote relationships, including persons supplying labor or material to a mere materialman" without protection. F. D. Rich Co., 417 U.S. at 122.

In addition to excluding those beyond two degrees of contractual privity to the prime contractor, the Miller Act has another limitation. Unlike the DBA and other federal labor and wage statutes, Miller was not designed with the welfare of workers in mind, but was instead tailored to protect suppliers and subcontractors. In the Supreme Court's reading, the Miller Act "exclude[s] ordinary laborers" from its scope, only extending to those "who perform[] for and take[] from the prime contractor a specific part of the labor or material requirements of the original contract." Clifford F. MacEvoy Co. v. U.S. ex rel. Calvin Tomkins Co., 322 U.S. 102, 109 (1944).

The restricted scope of application of these bond statutes means that Plaintiffs cannot qualify under the terms of the DCLMA alone because they neither worked in the capacity of suppliers or subcontractors, nor were they hired by Whiting-Turner or an immediate subcontractor. Indeed, if the DCLMA furnishes the only available remedy in cases such as this one, many workers employed directly at a job site would never be able to collect on a prime contractor's bond, either because they were hired beyond a certain orbit of contractual privity, see J.W. Bateson Co., 434 U.S. at 591, or because they only qualify as "ordinary laborers," who are ineligible under the Supreme Court's reading of the bond statute.

2. *DBA § 3144(a)*

The game is not over, however, because the DBA protects precisely those "ordinary

7

laborers" that the Miller Act appears to exclude. The DBA applies to any construction contracts for public works and public projects that exceed $2,000 in value and to which either the Federal Government or the District of Columbia is a party. See 40 U.S.C. § 3142(a). It obliges contractors on such projects to pay workers in accordance with prevailing wage rates, established by the Secretary of Labor. See id. In the event that contractors do not comply with prevailing wage rates, a worker may seek redress through the mechanism set out in DBA § 3144(a)(2). Promulgated in 1935 – just six days after the federal Miller Act was updated to reflect its current language – § 3144(a)(2) is broadly worded, granting a right of action to "all the laborers and mechanics who have not been paid the wages required" pursuant to the DBA. In contrast to the Miller Act and DCLMA, which condition their protections on a requisite level of contractual proximity to the prime contractor, DBA eligibility appears to hinge upon a laborer's presence at the job site. Section 3144(a)(2) stipulates that each "contractor or subcontractor" involved in a "contract" governed by the DBA "shall pay all mechanics and laborers <u>employed directly on the site of the work</u>, unconditionally and at least once a week . . . <u>regardless of any contractual relationship</u> which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics." § 3142(c)(1) (emphasis added).

Although the DBA does not separately delineate the terms "contract," "contractor," "subcontractor," or "laborer," these terms are defined in corresponding regulations promulgated by the Secretary of Labor. See 29 C.F.R. § 5.2. The term "contract" comprises "any prime contract which is subject . . . to the labor standards provisions of [the DBA] and <u>any subcontract of any tier thereunder</u>, let under the prime contract." § 5.2(h) (emphasis added). This definition, unlike that in the DCLMA, is not limited by a particular degree of separation from the prime contractor. The regulations, in fact, expressly disavow any requirement that a worker

demonstrate a particular contractual relationship, instead providing that "[e]very person performing the duties of a laborer or mechanic in the construction . . . of a public building or public work . . . is employed regardless of any contractual relationship alleged to exist between the contractor and such person." § 5.2(o). The regulatory definition of "laborer" is governed by function, not by contractual formality, and extends to "at least those workers whose duties are manual or physical in nature." § 5.2(m).

Even in the unlikely event that a court were to find the text of the DBA ambiguous, it would still be bound to apply DOL's regulatory definitions in making its decision. "Because the Secretary of Labor has interpreted the Act," courts must defer to the Secretary's judgment provided that these "interpretations are reasonable." AKM LLC v. Sec'y of Labor, 675 F.3d 752, 754 (D.C. Cir. 2012) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984)). In this case, the regulatory interpretations are more than merely reasonable – they are grounded in the most basic common sense. Because a prime contractor should have ample notice of laborers working at its project site, it can institute sufficient controls to ensure that they are accounted for and paid for their contributions, regardless of any particular contractual arrangement. In contrast to the situation with suppliers, who may come and go without any physical connection to a job site, there is far less risk that laborers will be completely "[un]known to the prime contractor," U.S. ex rel. E & H Steel Corp., 509 F.3d at 187, and thereby expose it to unforeseen liability.

3. *Interplay Between Statutes*

Regardless of the DBA's general scope of application, Defendants nevertheless argue that § 3144(a)(2) does not create a freestanding cause of action, and even if it does, whatever remedy it provides is functionally identical to that offered by the DCLMA. This is evident, Defendants

argue, in the text of § 3144(a)(2), which offers workers only the "same right . . . as is conferred by law on persons furnishing labor or materials." See Mot. to Dismiss at 9; Reply at 1, 4-8. Neither common sense nor a holistic reading of § 3144(a)(2) supports such a result.

Clearly titled as a "[r]ight of action," DBA § 3144(a)(2) provides that, if the Secretary of Labor's withholdings under the terms of a contract are "insufficient to reimburse <u>all the laborers</u> and mechanics who have not been paid the wages required[,] . . . the laborers and mechanics have the same right to bring a civil action and intervene against the contractor and the contractor's sureties as is conferred by law on persons furnishing labor or materials." (Emphasis added). Two points are notable here. First, the express title of § 3144(a)(2) indicates that Congress believed that it was creating a new and fully functional right of action, and not merely a superficial reference to remedies already available under the bond statutes. While many battles have been waged over whether or not an aggrieved worker can claim an implied right of action under the DBA and thereby circumvent the administrative-exhaustion requirements of § 3144(a), see, e.g., <u>Univers. Research Ass'n v. Coutu</u>, 450 U.S. 754, 780 (1981), courts have long recognized that § 3144(a)(2) furnishes an express cause of action once remedies have been exhausted. See, e.g., <u>U.S. ex rel. Bradbury v. TLT Const. Corp.,</u> 138 F. Supp. 2d 237, 241 (D.R.I. 2001).

Second, the formulation "all the laborers . . . who have not been paid" sets an expansive scope of application that is not obviously restricted by what follows. If Congress had intended to limit the scope of eligibility to sue on a bond to the narrow class of workers who might qualify under the terms of the Miller Act, it stands to reason that the legislature would have said so in clear and unambiguous terms or, more plausibly, would have completely omitted § 3144(a)(2) from the DBA. If Defendants are correct, § 3144(a)(2) would be mere surplusage, offering

nothing of value over and above the remedies already available via the Miller Act and DCLMA. The Court cannot ignore the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)).

Perhaps even more troubling, Defendants' assessment of § 3144(a)(2) would create two arbitrary classes of workers – first, those who satisfy the technical qualifications imposed by the terms of the Miller Act and DCLMA, and second, all otherwise DBA-eligible workers. If the Court were to endorse Defendants' highly restrictive interpretation, it might encourage prime contractors to insulate themselves behind several layers of subcontracts and thus opt out of the obligation to pay DBA-mandated wages, particularly as a project draws to a close and the government is no longer able to withhold funds. It should be obvious, accordingly, that all laborers present on the worksite of a DBA-eligible project should stand to benefit from the Act's protections, regardless of contractual formalities. The Court thus concludes that § 3144(a)(2) of the DBA creates an independent cause of action that grants the ability to collect on a prime contractor's bond to all eligible on-site workers, regardless of who hired them.

### B. Applicable Statute of Limitations

Defendants' final challenge pertains to the timeliness of this action. Because Plaintiffs narrowly missed the cut-off point for the DCLMA's one-year statute of limitations, see D.C. Code § 2-201.02, due in large part to their efforts to exhaust administrative remedies with DOL, Defendants urge the Court to dismiss the suit. See Mot. to Dismiss at 3-4; Reply at 4. Plaintiffs, however, assert that they benefit from a two-year period conferred by Section 255 of the Portal-to-Portal Act. Having already argued that all of the DCLMA's terms and conditions – including

11

its statute-of-limitations provision – are incorporated by reference into the DBA § 3144(a)(2), see Mot. to Dismiss at 9; Reply at 1, Defendants maintain that the Portal-to-Portal Act did not alter the limitations period available under the DBA, at least for suits on a prime contractor's bond. See Reply at 5-6. To further support this argument, Defendants rely upon past Supreme Court *dictum* that describes the PPA and Miller Act statutes of limitations as "incompatible," and which might be read as obliquely questioning whether the PPA period applies to suits on a prime contractor's bond. See id. (citing Coutu, 450 U.S. at 779-82). Ultimately, the Court agrees with Plaintiffs, finding that the plain language of PPA § 255, along with its drafting history and certain practical considerations, demonstrates Congress's intention to afford workers a two-year window for actions such as this one.

The Court begins with the text of the PPA, which offers convincing evidence that a two-year statute of limitations should govern in DBA suits to collect back wages against a prime contractor's bond. PPA § 255(a) provides, in relevant part:

> Any action . . . to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, and liquidated damages . . . under the Fair Labor Standards Act . . . the Walsh-Healey Act, <u>or the Davis-Bacon Act</u> . . . may be commenced <u>within two years</u> after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

(Emphasis added.)

As Plaintiffs note, the language "any action . . . to enforce any cause of action for unpaid wages" is expansive and appears to embrace all civil suits brought by workers to enforce DBA wage requirements. See Opp. at 7. While this limitation period has been found to apply to suits involving other statutes specifically named in § 255(a), particularly the Walsh-Healey Act, see

12

Unexcelled Chem. Corp. v. United States, 345 U.S. 59, 63-65 (1953), this Court is not aware of any opinion that has definitively addressed whether this longer period controls when an aggrieved worker seeks to collect on a Miller bond pursuant to DBA § 3144(a)(2). In the Walsh-Healey context, the Supreme Court has explained that where the "cause of action seems to be precisely described by and expressly included" in the text of the PPA, that limitations provision should control. See id. at 65. Accordingly, "when Congress, though perhaps mistakenly or inadvertently, has used language which plainly brings a subject matter into a statute, its word is final." Id. It is not the role of the courts to conclude "that Congress did not mean what it said." Id. This reasoning is no less compelling in the DBA context.

The PPA's background and drafting history also support a literal reading of § 255. As the Supreme Court has explained, the PPA was "intended to curtail the numerous suits for unpaid compensation and liquidated damages under the FLSA," following an earlier decision holding that workers could seek back-wage compensation for the time incurred transiting to and from their places of employment. Coutu, 450 U.S. at 780 (citing Anderson v. Mount Clemens Pottery Co., 328 U.S. 680 (1946)). In addition to prohibiting workers from claiming such "portal-to-portal" compensation under the FLSA, the Walsh-Healey Act, and the DBA for time spent commuting to and from their jobs, the PPA also established a single limitations period for any back-wage and overtime-compensation claim brought pursuant to these three statutes. "Although no portal-to-portal suits had been filed under the Davis-Bacon [Act] . . . Congress chose to include [the DBA] within the scope of the Portal-to-Portal Act on the ground that [the DBA], like the FLSA, related to minimum wages and [was] therefore affected by the Mount Clemens decision." Id. (internal citations omitted).

The Supreme Court has examined the interactions among the DBA, the Miller Act, and

the PPA's statute-of-limitations provision on just one occasion, and only tangentially. See id. at 779-82. In Coutu, the plaintiff argued that the presence of differing limitations periods in the PPA and the Miller Act "affirm[ed] the existence of a private cause of action under the [DBA]" in addition to the express cause of action found in § 3144(a)(2). See id. The Supreme Court disagreed, chastising the plaintiff for reading too much into the PPA and commenting that, "even if the [PPA] had been intended to create a longer statute of limitations" for DBA actions on a bond, this did not prove that the DBA contained an implied cause of action in addition to the § 3144(a)(2) remedy. Id. According to the Court, "Congress simply did not recognize that it had created two incompatible statutes of limitations under the Davis-Bacon Act." Id. The Coutu opinion did not further explore the relationship among the PPA, the DBA, and the Miller Act, nor did it definitively rule on which limitations period should control in a case such as this. Defendants nevertheless argue that because the Court described the two periods as "incompatible," the "applicability of the Miller Act one (1) year limitation is evidenced by the fact that the Supreme Court did not strike either one of the acts down." Reply at 6.

More likely, the Court's response was only intended to discredit the theory that the difference between the PPA and Miller Act limitations periods amounted to congressional affirmation that the DBA offered two avenues for worker redress – the express remedy of § 3144(a)(2) and a functionally separate implied remedy. The discrepancy between the two periods was simply not on Congress's radar at the time it promulgated the PPA.

Later observations in the Coutu case, also in *dictum*, further undermine Defendants' argument. In its review of the Act's drafting history, the Court observed that remarks made during Senate debate on the PPA "strongly suggest[] that the limitations period . . . was designed to apply to the explicit statutory remedy set forth in [§ 3144(a)(2) of] the Davis-Bacon Act."

14

Coutu, 450 U.S. at 780 n.34 (citing 93 Cong. Rec. 2252 (1947) (statement of Sen. McGrath)). Indeed, during debate over the PPA limitations period, Senator J. Howard McGrath of Rhode Island argued that a two-year window <u>might not be generous enough</u> for DBA actions because the "administrative procedures which are necessary to determine the validity of the workman's claim for back wages under the Davis-Bacon Act frequently take a considerable length of time which may very easily run for a period of more than 2 years." <u>Id.</u>

When considered in this historical context, there appears to be even less support for Defendants' argument that, due to the supposed incompatibility between the limitations periods in the PPA and Miller Act, back-wage suits initiated under the DBA – unlike those brought under the FLSA and Walsh-Healey Act – must be initiated within a one-year window. The difference between the two limitations periods can, in this Court's view, be explained by the dissimilar conditions facing workers and suppliers when they sue against the prime contractor's bond – conditions that Congress took into account when promulgating the PPA. As already discussed above, the Miller Act and DBA § 3144(a) protect two distinct groups of aggrieved persons and impose different prerequisites for bringing a civil action. To repeat: suppliers and subcontractors, unlike workers, are not required to exhaust any administrative remedies before initiating an action in federal court; if they have not been paid within a 90-day period, they can seek immediate redress. <u>See</u> 40 U.S.C. § 3133; <u>see also</u> D.C. Code § 2-201.02(a). Workers, however, must first seek a remedy with DOL, proceeding against the prime contractor's bond only after the government determines that it has not withheld sufficient funds under the contract. <u>See</u> <u>Lopez</u> <u>Castro</u>, 2014 WL 495464, at *5. Congress would thus have had good reason to afford workers a longer limitations period.

The facts of this case provide an apt example. Although Plaintiffs promptly notified the

15

prime contractor of their alleged underpayment and filed an administrative complaint with DOL in July of 2012, see Am. Compl., ¶¶ 22-23, DOL did not assign the matter to an investigator until February of 2013 or provide any response to Plaintiffs until April of the same year. See id., ¶¶ 24-25. The shorter limitations period would thus punish people like Plaintiffs for delays largely beyond their control.

The Court, therefore, concludes that because Plaintiffs' DBA action is subject to a two-year statute of limitations, it is timely.

## IV. Conclusion

For the forgoing reasons, this Court will issue a contemporaneous Order this day denying Defendants' Motion to Dismiss.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: April 14, 2014